UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

DAWN MARIE DAVIDE and
CHRISTOPHER LEE LUTTRELL,                      Case No. 16-12689 t11

    Debtors.

VINCENT P. LUJAN,

    Plaintiff,

v.                                                                                 Adv. No. 17-1007 t

DAWN MARIE DAVIDE and
CHRISTOPHER LEE LUTTRELL,

    Defendants.

## OPINION

Defendants filed their chapter 11 bankruptcy case roughly nineteen months after borrowing $250,000 from Plaintiff. The Court must now determine whether Plaintiff's claim is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), or (a)(6). After conducting a trial on the merits and hearing the arguments of counsel, the Court holds that Defendant's debt to Plaintiff is nondischargeable under § 523(a)(2)(A).

                                                       I.      FACTS

The Court finds:[1]

---

[1] In making its findings, the Court took judicial notice of the docket in Defendants' main bankruptcy case and in this adversary proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Plaintiff Vincent Lujan lives in Albuquerque, New Mexico. Lujan graduated from Valley High School and the University of New Mexico. In 1994, UNM awarded Lujan a Bachelor's degree in Business Administration, with an emphasis in accounting. He was an average student.

After graduation, Lujan began working for Southwest Airlines, where he held a number of supervisory or managerial positions. Lujan left Southwest in September 2007. Thereafter, Lujan worked as a member services manager with the New Mexico Educational Retirement Board (two and a half years), as a high school teacher for the Albuquerque Public Schools (one year), and as a contract review agent for the Bernalillo County finance department (three years). Currently, Lujan is employed by the New Mexico Department of Finance Administration, in the contract review bureau. He has held that position for about two and a half years.

Lujan owns five rental properties. He began buying rental property 25 years ago. He has bought or sold real estate more than ten times, in Nevada, New Mexico, and Tennessee. Several of the transactions were closed at title companies. Lujan also ran a trucking business from 1995-1997.

Defendant Dawn Marie Davide, also an Albuquerque resident, owns and manages several local businesses, including Homes by Dawn Davide, Inc.; La Bella Spa and Salon, LLC; La Bella Laser Aesthetics Med Spa, Inc.; and Vincent's Men's Grooming Salons, LLC ("Vincent's"). Davide holds a general contractor's license. The La Bella Spa and Salon shares a building with Vincent's, at 10126 Coors Boulevard, NW, Albuquerque, New Mexico. The staff at the two businesses is substantial, at one point totaling 65 employees.

Davide's main lender is U.S. Eagle Federal Credit Union. At all relevant times, the credit union had outstanding a $2.2 million loan to Homes by Dawn Davide, which Davide personally guaranteed.

Lujan knew the defendants to some extent before this dispute arose. He met Mr. Luttrell 15 to 20 years ago while working for Southwest Airlines. Lujan met Davide six or seven years ago when their children, who became friends, attended the same high school. Lujan never did business with either defendant before he made the loan at issue.

At some point in 2015, Lujan and Davide began discussing Davide's businesses, including Vincent's.[2] Davide told Lujan she had plans to expand Vincent's into larger cities in neighboring states. Davide said she was seeking an investor for the expansion. The parties also talked in general about Davide's current businesses. Davide and Lujan met at the La Bella/Vincent's building more than once to discuss the businesses and Lujan's potential investment. Davide testified that the Vincent's salon was still under construction at the time.[3]

Lujan claims he met with Davide and the then current CEO/CFO of Vincent's to discuss the Albuquerque businesses. He was told, he claims, that Davide's current businesses were "doing fantastic." Davide disputes this testimony.

Lujan testified that Davide gave him a three-page excel spreadsheet outlining a proposed start-up budget for a Vincent's in Denver. The total budget was $450,000. Davide asked Lujan to loan her $250,000, and said that the other $200,000 would be invested by her attorney. Davide told Lujan that she had found a great location in Denver for the new salon.

The parties discussed collateral for the proposed loan. Davide drove Lujan around Rio Rancho, New Mexico and showed him all of the lots she owned that she could offer as collateral.

---

[2] Apparently the conversation started because Davide's daughter told Lujan that her mother (Davide) owed some lots in a Rio Rancho subdivision and could sell one to Lujan at a favorable price. Lujan then talked to Davide about the lots, but ultimately decided not to buy one.
[3] According to Davide's testimony at trial, Vincent's was incomplete in February 2015; certain licenses had not been obtained, treatment rooms were unfinished, and neither pool tables nor indoor taps had been installed.

-3-

Lujan ultimately chose three of the lots (the "Lots"). Davide told Lujan the Lots were free and clear of liens. She made this representation several times, and clearly it was important to Lujan.

Davide testified that Lujan was not particularly focused on how she spent the money, so long as his investment was properly secured. Lujan, on the other hand, testified that the clear understanding of the parties was that he was investing in a new Denver Vincent's. Lujan was motivated in large part by a favorable rate of return on his investment.

At some point, someone drafted a promissory note and a mortgage for a $250,000 loan secured by the Lots.[4] Most likely, the documents were prepared by someone who worked for Davide. Lujan testified that he received drafts of the documents by email and requested certain changes, which were agreed to. The documents are not well drafted.

Lujan eventually agreed to loan Davide $250,000, at 12% interest, secured by a first mortgage on the Lots. The two met at Davide's credit union on April 17, 2015, to close the loan transaction. Present off and on during the meeting was Davide's loan officer, Lawrence Geter. At the meeting, Lujan delivered a $250,000 cashier's check to Davide, payable to her order.[5] In exchange, Davide gave Lujan a promissory note for $250,000 and a "Mortgage Deed" on the Lots. Both the note and mortgage were notarized at the meeting by a credit union employee.

The note required Davide to make monthly interest-only payments for one year, beginning May 16, 2015.[6] The note gave Lujan an option to:

> stop interest payments and convert [his] investment into 25% for an equity share position for Vincent's Men's Salon and Lounge in the Albuquerque location . . .

---

[4] Both Davide and Lujan testified that they did not draft the documents. The testimony seems credible.

[5] Lujan testified that he executed the check to Davide, and not Vincent's Salon, because he wanted to hold her personally responsible for repayment.

[6] Among many other deficiencies, there is no stated maturity date in the note, and the interest rate is less than clear. The mortgage, however, describes the note as having a 12% rate.

-4-

and projected Denver location (address to be determined) as well as future Vincent's locations.

The mortgage provides in part:

> Borrower further covenants and warrants to Lender that Borrower is indefeasibly seized of said land in fee simple; that Borrower has lawful authority to mortgage said land and that said land is free and clear of all encumbrances except as may be expressly contained herein.

According to Lujan, Davide said she would have her "title company representative" record the mortgage. Lujan did not buy a mortgagee policy of title insurance, get a title search, or get an appraisal. Lujan left the original mortgage with Davide, taking her at her word that she would have it recorded. She did not. On January 19, 2016, Lujan finally recorded the mortgage himself.[7] By that time, Davide had conveyed the Lots to a relative.[8]

The credit union apparently held a prior mortgage on the Lots, but the evidence on this point is general and inconclusive. The Court does not have a title report on the Lots.

Unbeknownst to Lujan, the credit union's $2.2 million loan to Homes by Dawn Davide was in default. A default letter had been sent. In response, Davide had negotiated reinstatement terms with the credit union. One condition of reinstatement was that Davide had to pay $150,000 on the loan.

Also unbeknownst to Lujan, Davide intended to use $150,000 of his loan proceeds to reinstate the credit union loan. Davide was also seriously behind schedule in paying some of her subcontractors and suppliers. She intended to use the balance of Lujan's loan proceeds to pay off some of this past-due debt.

---

[7] Lujan testified that he recorded three claims of lien on May 1, 2015, and another on June 12, 2015.
[8] Davide's Statement of Financial Affairs discloses that the Lots were transferred to her sister-in-law on May 29, 2015.

-5-

After Lujan left the credit union on April 17, Davide turned the $250,000 check over to Mr. Geter. He deposited the check, applied $150,000 to the defaulted loan, and deposited the balance into Davide's personal account.[9] She used the $100,000 to catch up on past due bills, including bills for building out the Vincent's in Albuquerque. None of the money was used to open a Denver Vincent's.

Lujan got "cold feet" almost immediately after he made the loan. He called Davide the next day and asked for his money back. She put him off. He badgered Davide about the loan for several weeks, sending her text messages that Luttrell testified were borderline threatening. Lujan visited Davide's home on May 3, 2016, and secretly recorded their discussion. During the conversation, Davide assured Lujan that the Lots were free and clear of liens or encumbrances.

Davide never paid Lujan back, making only made three or four of the required monthly interest-only payments. When she and Luttrell filed this bankruptcy case on October 31, 2016, Davide owed about $288,000 in principal and interest.

Davide made a number of material misrepresentations and omissions in her interactions with Lujan. She never told Lujan that she was in default under her credit union loan, nor about her agreement to use $150,000 of the loan proceeds to cure the default. She knew Lujan was under the impression his investment would be used to open a Denver Vincent's, yet she never disabused him of the notion. Davide did not tell Lujan that her businesses were having substantial financial problems, and that she desperately needed his $250,000 (and more) to hold creditors at bay. Davide also knew or should have known that the Lots were encumbered, but lied to Lujan about the status of title. Davide also misled Lujan about her intention to record his mortgage. Finally, Davide

---

[9] The $150,000 loan payment appears to have been part of a loan modification agreement between Davide and the credit union. Davide testified that the modification helped reduce her monthly payment obligations. Lujan had no knowledge about any of this.

-6-

conveyed the Lots to her sister-in-law six weeks after mortgaging them to Lujan (but before his mortgage was recorded), an overtly underhanded action.

Lujan's behavior was honest, in comparison, albeit very naive. He did nothing to protect his investment. He conducted no due diligence before making the loan. He did not perform a title search, review Davide's books and records, review income tax returns, or take any other actions a reasonable business person would have taken before making a $250,000 commercial loan for a start-up retail business in a different city and state. Lujan should have hired a lawyer, but did not. He should have bought a mortgagee policy of title insurance, but did not. Had he wanted to "invest" in the proposed Denver Vincent's, he should have loaned the money to Vincent's Salon LLC, not Davide personally. He should have retained some control over the loan proceeds and insisted on regular progress reports.

The amount due under the note as of December 11, 2017, is $319,559.92.[10]

## II.   DISCUSSION

A.   § 523(a)(2)(A).

1.   Elements. Section 523(a)(2)(A) excepts from discharge any debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ." A creditor seeking to except its debt from discharge under § 523(a)(2)(A) must prove, by a preponderance of the evidence that: (1) the debtor made a false representation; (2) the debtor made the false representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was justifiable; and (5) the representation caused the creditor to sustain a loss. *Johnson v. Riebesell*

---

[10] $250,000 (principal) + $79,559.92 ($82.19 daily interest rate for 968 days between April 17, 2015 and December 11, 2017) - $10,000 (four interest-only payments of $2,500).

-7-

*(In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009) (quoting *Fowler Bros. v. Young*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

"False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Adams Cty. Dept. of Soc. Services v. Sutherland–Minor (In re Sutherland–Minor)*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006) (quoting *Cobb v. Lewis (In re Lewis)*, 271 B.R. 877, 885 (10th Cir. BAP 2002)). False pretenses under § 523(a)(2)(A) are "'defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" *Id.* (quoting *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)). "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013).

The failure to disclose material facts is actionable as a false representation or a false pretense under § 523(a)(2)(A). *See Fowler Bros.*, 91 F.3d at 1374; *Haeske v. Arlington (In re Arlington)*, 192 B.R. 494, 498 (Bankr. N.D. Ill. 1996) (failure to disclose facts is a misrepresentation where the omission creates a false impression known by the debtor); *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014) ("a debtor's silence as to a material fact can constitute a false representation under § 523(a)(2)(A)."). "A borrower has the duty to divulge all material facts to the lender." *Caspers v. Van Horne (In the Matter of Michael Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987). This does not mean that the debtor must "bare his soul" to the creditor, but the creditor does have "the right to know those facts touching upon the essence of the transaction." *Caspers*, 823 F.2d at 1288. A debtor must disclose facts he knows "may justifiably

-8-

induce the other party to act with respect to the transaction to be consummated." *In the Paint, L.L.C. v. Archibald (In re Archibald)*, 482 B.R. 378, 390 (Bankr. D. Utah 2012).

The Tenth Circuit construes § 523(a)(2)(A) narrowly to limit the harsh result of nondischargeability to "frauds involving moral turpitude or intentional wrong." *DSC National Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012) (quoting *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986). To avoid discharge based on false pretenses, false representation, or actual fraud, the creditor must prove the debtor "acted with the *subjective intent* to deceive the creditor." *Johnson*, 477 B.R. at 169 (emphasis in original). "Intent to deceive may be inferred from the totality of the circumstances." *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010).

2. Davide's False Representations and Omissions. As set out above, the Court finds that Davide made material misrepresentations and omissions to Lujan about the financial condition of her businesses, her intended uses of the loan proceeds, and the title to the Lots. Her businesses were not "doing fantastic." She was in no position to expand to Denver. To the contrary, her businesses were short on cash and losing money. She never intended to use Lujan's loan money to open a Denver Vincent's. Finally, she never intended to give Lujan a first mortgage on the Lots, and probably knew she couldn't even if she had wanted to.

3. Intent to Deceive. Davide intended to deceive Lujan. She knew if she told Lujan the truth, there was no way he would loan her $250,000. She was desperate for the money, and was willing to say anything to Lujan to close the loan deal. She knew she was painting a false picture of her businesses, her intentions, and the value of the promised collateral. She did it anyway.

Case 17-01007-t    Doc 28    Filed 12/11/17    Entered 12/11/17 14:14:58 Page 9 of 15

4. <u>Reliance</u>. Lujan relied on Davide's representations and omissions. There is no question about that. He would have been wiser not to, but he did.

5. <u>Justifiable Reliance</u>. The main question before the Court is whether Lujan's reliance on Davide's misrepresentations and omissions was "justifiable." "The appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representation." *In re Riebesell*, 586 F.3d at 791–92 (citing *Field v. Mans*, 516 U.S. 59, 74–75 (1995)). Rather, the key question is "whether the . . . creditor's reliance was 'justifiable' from a subjective standpoint." *Id.*

> In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." Id. at 71, 116 S.Ct. 437 (quotation omitted). Even under the "justifiable" test, however, the plaintiff must "use his senses" and at least make "a cursory examination or investigation" of the facts of the transaction before entering into it. Id. (quotation omitted). Moreover, this test "does not leave [objective] reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the [objectively] reasonable, the greater the doubt about reliance in fact." Id. at 76, 116 S.Ct. 437. In effect, "reasonableness goes to the probability of actual reliance."

*Id.*

> As many bankruptcy courts have opined, the justifiable reliance standard is a "low," "fairly low," or "relatively low" standard,

*In re Snyder,* 421 B.R. 602, at *3 (10th Cir. BAP 2009) (unpublished).

"Reliance is not justifiable if the facts and circumstances make it apparent from a cursory glance that the representations are false, or where the creditor 'has discovered something which should serve as a warning that he is being deceived.'" *Penix v. Parra (In re Parra)*, 483 B.R. 752, 769 (Bankr. D.N.M. 2012) (quoting *Field*, 516 U.S. at 71). A creditor must undertake further investigation of his own, beyond a mere "cursory glance," in situations where "under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory

-10-

glance, or he has discovered something which should serve as a warning that he is being deceived . . ." *Field*, 516 U.S. at 71.

> When determining if a plaintiff's reliance was justifiable courts consider whether there were any "red flags" in the transaction that would have put the creditor on notice that further investigation was warranted. *In re Watson*, 958 F.2d 977, 980 (10th Cir. 1992); *see also In re Osborne,* 520 B.R. 861, 870 (Bankr. D.N.M. 2014) (Thuma, J.) (stating, "reliance on a debtor's representations is justifiable if no "red flags" alert the creditor that further investigation is necessary").

(*Boyer Ins. Group v. Harrision E. Smith* (*In re Harrision E. Smith*), 2017 WL 5198149, at *5 (Bankr. D.N.M. 2017).

The case law is fairly uniform that Lujan had no duty to search the real estate records and check up on Davide's representations. *See, e.g., Sanford Institution for Savings v. Gallo,* 156 F.3d 71, 74 (1st Cir. 1998) (lender did not have to conduct a title search; taking customer's word for title status was justifiable); *In re Snyder*, 421 B.R. 602, at *4 (10th Cir. BAP 2009) (bail bondsman was not required to check the bankruptcy records; her reliance on the work of her customer was justified); *In re Osborne*, 520 B.R. at 872 (individual lender was justified in relying on representation that property was unencumbered); *Stewart Title Guaranty Company v. Robert-Dude*, 497 B.R. 143 (S.D. Fla. 2013) (reversing the bankruptcy court, the district court held that title company justifiably relied on borrower's representation of no encumbrances); *Stewart Title Guar. Co. v. Dude,* 708 F.3d 1191 (10th Cir. 2013) (title company justifiably relied on owner's representation of no liens).[11] *Cf. In re Gemme,* 459 B.R. 493 (Bankr. M.D. Mass. 2011) (sophisticated lender was not justified in making a mortgage loan to an unknown borrower without searching the title record).

---

[11] In so holding, Judge Gorsuch said "the precise work performed by the adjectival epithet "justifiable" when it comes to the reliance element in fraud is more than a little elusive." 708 F.3d at 1193.

-11-

The Court finds that Lujan's reliance on Davide's misrepresentations was justifiable. Lujan was foolish to take Davide at her word, but there is nothing in the record that appears to be a "red flag." It may not have been objectively reasonable to rely on Davide's word alone, but under the low standard discussed above, it was subjectively justifiable. "The design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and security enable them to protect themselves . . . no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." *Sanford Institution for Sav. v. Gallo,* 156 F.3d 71, 74 (1st Cir. 1998) (quoting Prosser and Keeton on Torts § 108, at 750-52). Despite his degree in business administration, and his work experience, Lujan is quite unsophisticated in commercial matters.

6. <u>Loss</u>. Finally, Lujan suffered a loss because of Davide's misrepresentations and omissions. Had Davide been straight with Lujan, he never would have made the loan. "[F]or a creditor to establish that a debt is not dischargeable, he must demonstrate that there is a causal nexus between the fraud and the debt." *In re Rollison*, 2013 WL 5797861, at *3 (10th Cir. BAP 2013) (quoting *Archer v. Wagner*, 538 U.S. 314, 325 (2003)). "A false representation is the proximate cause of damage when the false representation is a 'substantial factor in determining the course of conduct that results in [the] loss,'" and the "creditor's loss [can] 'reasonably be expected to result from the creditor's reliance'" on the debtor's misrepresentation. *In re Musgrave*, 2011 WL 312883, at *9–*10 (10th Cir. BAP 2011) (quoting Restatement (Second) of Torts (1976) § 546 and § 548A)); *In re Rodriguez*, 525 B.R. 485, 493-94 (Bankr. D.N.M. 2015). The Court finds that Davide's misrepresentations and omissions were the proximate cause of Lujan's loss.

B. <u>§ 523(a)(4)</u>.

Section 523(a)(4) provides:

-12-

>   A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
>   (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

To be nondischargeable under this section, debts "for fraud or defalcation while acting in a fiduciary capacity" must have been incurred with intentional wrongful conduct, bad faith, moral turpitude, or other immoral conduct. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74 (2013). To prevail under § 523(a)(4) on a fiduciary capacity theory, a creditor must demonstrate (1) the existence of a fiduciary relationship between the debtor-defendant and the creditor; and (2) a defalcation committed by the debtor-defendant during the course of the fiduciary relationship. *See Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996). The existence of a fiduciary relationship is a "threshold issue to the determination of dischargeability under 11 U.S.C. § 523(a)(4)." *Foxworth Gailbraith Lumber Co. v. Manelos (In re Manelos)*, 337 B.R. 409, 412–13 (Bankr. D.N.M. 2006).

The Tenth Circuit has adopted a narrow interpretation of the fiduciary duty under 11 U.S.C. § 523(a)(4). *See Duncan v. Neal (In re Neal)*, 324 B.R. 365, 370 (Bankr. W.D. Okla. 2005), *aff'd*, 342 B.R. 384 (10th Cir. BAP 2006) ("The Tenth Circuit has taken a very narrow view of the concept of fiduciary duty under this section."). In this circuit, fiduciary duties under § 523(a)(4) only arise when one party holds the property of another pursuant to an express or technical trust. *In re Morrow*, 2017 WL 2062859, at *5 (Bankr. D.N.M. 2017).

Here, there is no evidence of embezzlement or larceny, nor that Davide owed any fiduciary duties to Lujan. Lujan's § 523(a)(4) claim fails.

C.      § 523(a)(6)

Section 523(a)(6) excepts from discharge any debts which arose from actions resulting in "willful and malicious injury." A creditor must prove: (1) either he or his property sustained an

-13-

injury; (2) the injury was caused by the debtor; (3) the debtor's actions were "willful;" and (4) the debtor's actions were "malicious." *In re Deerman*, 482 B.R. 344, 369 (Bankr. D.N.M. 2012). Nondischargeability under § 523(a)(6) requires that the debtor's actions be both willful and malicious. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

To be willful, a debtor must have intended both the act and the resulting harm. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."). For a debtor's actions to be malicious, they must be intentional, wrongful, and done without justification or excuse. *Deerman*, 482 B.R. at 369 (citing *Bombardier Capital, Inc. v. Tinkler*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004)). The Tenth Circuit follows a subjective standard in determining whether a defendant desired to cause injury or believed the injury was substantially certain to occur. *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 2000 WL 1275614, at *3 (10th Cir. 2000)

Knowing or intentional conduct is not enough to trigger § 523(a)(6) liability; the plaintiff must also show that the defendant intended to do harm. *See, e.g.*, *In re Osborne*, 520 B.R. at 873 (denying plaintiff's § 523(a)(6) claim because, while defendant intentionally concealed property encumbrances, there was no evidence that defendant intended harm or acted with malice).

Davide made numerous misrepresentations and omissions to Lujan, but there is no evidence she intended to harm Lujan or bore him any malice. From what the Court can tell, Davide thought the Lujan loan might help her return to profitability, allowing her to repay the debt. Lujan's § 523(a)(6) claim fails.

-14-

Case 17-01007-t    Doc 28    Filed 12/11/17    Entered 12/11/17 14:14:58 Page 14 of 15

III.  CONCLUSION

Lujan carried his burden of proving all of the elements of his § 523(a)(2)(A) claim. Davide's debt to him therefore is nondischargeable. The Court will enter a separate judgment to that effect.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: December 11, 2017

Copies to:

Nephi D. Hardman
6709 Academy NE, Ste. A
Albuquerque, NM 87109

Edward A. Mazel
1122 Central Avenue SW, Ste. 1
Albuquerque, NM 87102